## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **STEPHEN M. COOKE, JR.,** | * | |
| | * | |
| **Petitioner,** | * | |
| | * | |
| **v.** | * | **Civil Case No. SAG-19-3256** |
| | * | |
| **ALLEN GANG, WARDEN,** *et al.,* | * | |
| | • | |
| **Respondent.** | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>MEMORANDUM OPINION</u>

Stephen M. Cooke, Jr. ("Cooke") filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on November 12, 2019, challenging the convictions he sustained in the Circuit Court of Baltimore County, Maryland. ECF 1. After nine days of trial, on June 18, 2015, a jury convicted Cooke of various offenses, including first-degree murder and witness tampering. ECF 13-13. On August 20, 2015, he was sentenced to life in prison without parole, plus other consecutive terms of incarceration. ECF 13-14.

In his § 2254 petition, Cooke challenges his convictions on five separate grounds, which were previously raised in his post-conviction proceedings in the state courts. Cooke, who is self-represented, also supplemented the instant petition with three additional filings, in which he outlines facts he views as relevant to his contentions. ECF 6, 9, 10. The State filed an answer to Cooke's habeas corpus petition, with numerous attachments consisting largely of the records and transcripts from the state proceedings. ECF 13. Cooke filed a Reply. ECF 16. The issues pertaining to this motion have been fully briefed, and in light of the extensive record, no oral argument is needed. *See* Local Rule 105.6 (D. Md. 2018). For the reasons set forth below, Cooke's Petition for Writ of Habeas Corpus will be denied.

## I.      BACKGROUND

On April 20, 2000, Cooke discovered the body of his girlfriend, Heidi Bernadzikowski, in their Dundalk residence. Fourteen years later, after law enforcement officials used advancements in DNA evidence to further the investigation, the State charged Cooke with having employed a middleman, Grant Lewis, to hire a contract killer, Alexander Bennett, to kill Ms. Bernadzikowski. In September, 2011, Bennett's DNA was found under Ms. Bernadzikowski's fingernails, and he ultimately alerted authorities about Cooke's and Lewis's involvement in the murder. Later, while Cooke and Lewis were detained at the same facility, the State charged Cooke with hiring another inmate to murder or intimidate Lewis, in order to prevent his testimony at Cooke's trial for the murder of Ms. Bernadzikowski.

In June, 2015, Cooke was tried for multiple charges relating to Ms. Bernadzikowski's death, including first-degree murder, conspiracy to commit murder, and solicitation to commit murder, along with charges relating to the attempted attack on Lewis, including attempted murder, solicitation of murder, first-degree assault, solicitation of first-degree assault, and two counts of solicitation to intimidate a witness. The jury convicted Cooke of all three charges relating to Ms. Bernadzikowski, and of the first-degree assault and witness intimidation charges relating to Lewis. Cooke received a sentence of life imprisonment without parole for Ms. Bernadzikowski's murder, with consecutive 25-year and 5-year sentences for the remaining charges.

Cooke appealed his conviction to the Court of Special Appeals of Maryland. That Court issued an opinion, on May 1, 2017, affirming the conviction and providing the following useful summary of the relevant facts:

**The Murder**

The State's theory was that Stephen Cooke, facing bankruptcy and the end of his relationship with Ms. Bernadzikowski, hired a stranger to kill her, so that he could

collect on her $700,000 life insurance policy.  The State presented evidence that, after corresponding with Cooke online, Grant Lewis sent Alexander Bennett from Colorado to Maryland to commit the murder.  Gaining access to the house with keys left by Cooke, Bennett lay in wait until Cooke dropped off Ms. Bernadzikowski at their house.  After Ms. Bernadzikowski entered the house, Bennett strangled her, cut her throat to make sure she was dead, staged a crime scene, disposed of evidence, and returned to Colorado.

Although the investigators suspected that Cooke might be responsible for the murder, he had an alibi, having performed errands and visited his sister while Ms. Bernadzikowski was killed.  There were no witnesses, confessions, or forensic leads.  The DNA found under the victim's fingernails was a mix of hers and of a male donor who could not have been Cooke, but could not be identified with the technology available at that time.  At that relatively early stage in the era of digital communications, the police did not think to search the computer that Cooke had used to communicate with Lewis.

As the investigation went cold, Cooke attempted to collect on two policies insuring Ms. Bernadzikowski's life.  Although Cooke was named as the primary beneficiary under the policies, her family contested his claims in a civil suit.  Several days into that trial, Cooke proposed a settlement under which Ms. Bernadzikowski's mother would receive 80 percent of the insurance proceeds, while Cooke would receive only 20 percent.  The family accepted Cooke's proposal.

In September of 2011, 11 years after the murder, the Baltimore County police re-tested the DNA that was found under the victim's fingernails, employing technological advances that allowed the mixed-donor DNA samples to be analyzed separately.  A profile was matched to Alexander Bennett, a Colorado resident.  Because Maryland Transportation Authority records indicated that Bennett had been stopped while walking along Interstate 295 outside Baltimore on March 30, 2000, about three weeks before the murder, investigators went to Colorado to interview him.  When asked how his DNA had gotten under Ms. Bernadzikowski's fingernails, Bennett maintained that he had been stuck and homeless in Maryland during April 2000, where he had an altercation with a young woman at a bus stop.  After Bennett identified Ms. Bernadzikowski in a photograph and said that she was the woman with whom he had the altercation, he was arrested, charged with her murder, and extradited to Maryland.

While in Colorado, investigators also met with Grant Lewis, whom Bennett identified as someone who could corroborate his claim that he had been abandoned in Baltimore by friends while on the way to a concert.  The State brought Lewis to Maryland on a material-witness warrant to testify at Bennett's trial.  *See Lewis v. State,* 229 Md. App. 86, 90-91 (2016), *aff'd,* ___ Md. _____ (April 24, 2017).

On March 18, 2014, the day on which Bennett was scheduled to go to trial for the murder of Ms. Bernadzikowski, he confessed, implicating Lewis as the middleman

who negotiated the killing and Cooke as the person who hired him.  Bennett pleaded guilty to first-degree murder and was sentenced to life with all but 30 years suspended under a plea deal that required him to testify against Cooke and Lewis. Cooke and Lewis were arrested and charged with Ms. Bernadzikowski's murder.

## Witness Intimidation

While awaiting trial, Cooke and Lewis were both jailed at the Baltimore County Detention Center.  Cooke shared a cell with James DiVenti, who reported to authorities that Cooke asked him to arrange a hit on Lewis, "the guy he . . . did the emails with[,]" because he could "ruin" or "finish" Cooke.  DiVenti, wearing a recording device, recorded conversations with Cooke on June 13 and July 9, 2014.

In the recordings, Cooke and DiVenti discussed plans involving an unidentified inmate on the same tier as Lewis.  When DiVenti informed Cooke that there were two Lewises on that tier and asked for a first name, Cooke answered, "Grant Lewis."

DiVenti told Cooke that Lewis was "gonna get hit, he's gonna get hurt" and that he "doubt[ed]" that Lewis was "going to talk."  A little later, DiVenti told Cooke that Lewis would be "getting his shit split" and that the assailant had been instructed to tell Lewis "what [Cooke] said, 'don't go to court, you don't know nothing from fuckin' nothing.'" According to DiVenti, the message to Lewis would be that "he's not supposed to say nothing about [Cooke's] case, not supposed to testify."

DiVenti also said that the assailant wanted to be paid $100 in "dots," referring to Green Dot cards, which are untraceable, prepaid money-cards that inmates use covertly in black-market commerce in jail.  Cooke obtained the serial number for a $100 Green Dot card, which he delivered to DiVenti, who turned it over to investigators.

Cooke was charged with soliciting and attempting the murder of Lewis, or alternatively his assault, and with soliciting the intimidation of a witness. Before trial, the court granted the State's motion to join the murder and witness intimidation charges for trial.

## Trial

At trial, Alexander Bennett testified that in 2000 Grant Lewis sent him to Baltimore to perform a contract murder for a man who wanted his girlfriend killed and who had promised to pay them $60,000 from the victim's life insurance proceeds. Bennett flew to Baltimore, but had to wait several weeks while arrangements were made.  During this time, Bennett called Lewis every day, using pay phones to make collect calls.

Before the murder, Bennett met with Cooke at the townhouse that he and Ms. Bernadzikowski rented.  At the meeting Cooke detailed his plan to provide Bennett access to the house and stressed that the murder should look like an accident, because it would be more difficult to obtain the insurance money if the death were to be ruled a homicide.  Bennett made additional reconnaissance trips to the townhouse, in one instance using a screwdriver to break in through the basement door so that he could surveil the residence, and in another posing as a member of a neighborhood watch group so that he could see what Ms. Bernadzikowski looked like.

The night before the murder, at a bus stop, Bennett briefly met with Cooke, who told him that on the following day he would leave a key to the back door so that Bennett could be waiting when Ms. Bernadzikowski returned to the residence.

On the day of the murder, Cooke confirmed the plan by email to Lewis, who relayed the message to Bennett on a payphone call.  Bennett entered the townhouse with a key to the same basement door that he had previously broken into.  After moving the dog (a Rottweiler) into the basement, Bennett watched as Cooke parked his red Honda in front of the residence, dropped off Ms. Bernadzikowski, and drove away.  When Ms. Bernadzikowski entered the front door, Bennett grabbed her from behind.  As she fought and scratched his face, he choked her until she was unconscious.  "[T]o make sure she was dead[,]" Bennett used a knife to cut her throat.

Bennett arranged the crime scene to suggest a botched robbery or a serial killing.  After arranging Ms. Bernadzikowski's body with her legs crossed, Bennett dumped her purse out, wiped surfaces, messed up the house, and used the victim's lipstick to write "#1" on the wall.  When he left, Bennett disposed of the knife, the key, and his gloves and clothes in a commercial dumpster.  He returned to Colorado on a bus ticket bought by his sister.  According to Bennett, he and Lewis were never paid for the murder.

Forensic and circumstantial evidence corroborated Bennett's account of the murder and supported the State's theory that Cooke's motive for the murder was to obtain the proceeds of Ms. Bernadzikowski's life insurance policy.  Cooke, who had previously filed for bankruptcy protection, told police on the night of the murder that he was in the process of filing a second bankruptcy case.  Yet, in February 2000, he had applied for a life insurance policy with a death benefit of $900,000.  At the same time, Ms. Bernadzikowski, age 24, had applied for a $700,000 life insurance policy.  Cooke and Ms. Bernadzikowski made each other the primary beneficiaries of their respective policies and paid enough to obtain an immediate binder that would cover them in a reduced amount while the applications went through the underwriting process.

During that process, Cooke called the insurance agent several times, asking about the documents that were needed to complete the underwriting review, including

Ms. Bernadzikowski's medical records. Because the insurer did not receive those records within the 60-day binder period, it sent written notice, dated April 10, 2000, that Ms. Bernadzikowski's binder had lapsed. Cooke claimed that, after receiving the letter, he called the insurance agent and received assurances that the medical records had been submitted and that Ms. Bernadzikowski's policy was in effect at the time of her death on April 20, 2000.

On the evening of the murder, Cooke told the police that he and Ms. Bernadzikowski were planning to be married in a couple months. In the weeks before she was murdered, however, Ms. Bernadzikowski had had separate conversations with three different friends, all of whom testified that she was unhappy in her relationship with Cooke and was thinking about ending it. About two weeks before her death, Ms. Bernadzikowski discussed beginning a romantic relationship with one of these friends, whom she kissed. In response to her repeated requests, another friend had lent her $200 in cash on the evening of April 18, 2000, two days before she was murdered, because she was moving out and "leaving" Cooke and needed to put her belongings in storage. On the night before the murder, Ms. Bernadzikowski told a female friend that "she was thinking about leaving" Cooke.

Natalie Ott confirmed Bennett's testimony that in March 2000 she drove him and Lewis to the airport in Colorado. She testified that earlier that day the two men had told her that "they were two of the biggest organized crime members in Colorado, and that they were hired to go to Baltimore to make a lot of money." Ott walked Bennett, who had a one-way ticket to Baltimore, to the gate for his flight. During the following month, Bennett called her collect from Baltimore "a few times."

Bennett testified that he flew to Baltimore with no money, no murder plan, no photos, and only Ms. Bernadzikowski's name, work address, and directions to her house, printed out from MapQuest. While walking from Baltimore-Washington International Airport to Dundalk, he was stopped by an officer, who expressed concern about the danger of walking along a highway at night. The officer gave him a ride to Dundalk, dropping him a few blocks away from the townhouse shared by Cooke and Ms. Bernadzikowski. Maryland Transportation Authority records confirm that this encounter occurred on March 30, 2000.

In the days before her murder, Ms. Bernadzikowski herself confirmed Bennett's account of surveilling her residence. She reported both to the rental property manager and to Cooke that a black or Hispanic male with a tattoo on his left inner forearm had come to the door, saying something about starting a block watch program. She reported being frightened by the encounter. Bennett matched the description that she gave.

The wooden basement door, where Bennett had broken into the townhome the week before the murder, showed distinctive gouging that was consistent with Bennett's testimony that he used a screwdriver to loosen the lock enough to open the door.

6

On April 19, 2000, the day before the murder, the property management company replaced all three exterior door locks, giving three sets of the two new keys to Cooke. Consistent with Bennett's testimony that Cooke left him a key to the back door, there was no sign of forced entry on the night of the murder. Consistent with Bennett's testimony that he threw away the key that he had used to enter the house, Cooke returned only two sets of keys to the property manager on June 2, 2000.

The physical evidence was also consistent [with] Bennett's account of how he staged the crime scene to look like a robbery or serial killing. Written in lipstick on the wall above Ms. Bernadzikowski's body was "#1," and her legs were crossed. The contents of her purse were dumped on the floor near her body. Upstairs, a mattress was pulled askew, drawers were opened, and clothes were scattered on the floor.

After confessing to the murder, Bennett identified Cooke from a photo, as "the boyfriend" who ordered the killing, met with Bennett, but did not pay for the killing. According to DiVenti, Cooke confessed, in unrecorded conversations, to hiring Lewis, meeting with Bennett, and (in his words) "stiffing" them after the murder.

Thomas Scott Hood, a Towson attorney, testified about the civil litigation in 2002-03 regarding two life insurance policies covering Ms. Bernadzikowski. Cooke was the primary beneficiary on both a $52,000 policy through her employer and a State Farm policy in the face amount of $700,000; Ms. Bernadzikowski's mother and brother were secondary beneficiaries on those policies. There were disputes over whether the State Farm policy was in effect for the full amount or for only the $300,000 covered by the binder and over whether Cooke or the Bernadzikowskis were entitled to the proceeds. In a March 2002 deposition, Cooke testified that, after his insurance agent assured him and Ms. Bernadzikowski that her missing medical records "had been taken care of," they threw away the April 10, 2000, letter in which the insurer terminated the policy, believing "the policy was in effect" for the full $700,000. Several days after trial began on the civil suit, Cooke's attorney proposed a settlement, under which Cooke received only 20 percent of the policy proceeds, and Ms. Bernadzikowski's mother received 80 percent. The Bernadzikowskis accepted the offer.

Cooke took the stand and denied any involvement in the murder. Cooke also denied that heh asked DiVenti to harm Grant Lewis. He claimed that he went along with whatever DiVenti was saying in the recorded conversations because he was afraid of DiVenti, who he said was a "bully." Despite Cooke's claims, however, the recordings include inculpatory statements in which Cooke identified "Grant Lewis" as the correct target, asked DiVenti to tell him what to do, authorized DiVenti to "handle it," expressed his trust in DiVenti, and asked how the inmate who would do the hit "knows about Bennett?"

Corroborating DiVenti's testimony that Cooke agreed to pay for the hit on Lewis with "dots," Cooke's former wife testified that during a jail visit on July 22, 2014,

he asked her to purchase $50 Green Dot cards.  The next day, she bought a single
$100 card, to avoid paying two service fees, and the transaction was recorded on
the store's video surveillance system.  When she visited Cooke in jail on July 24,
2014, she held the card up to the glass while he wrote down the serial number.  On
August 14, 2014, Cooke, who had been temporarily moved to another tier, gave
DiVenti the serial number, which DiVenti reported to investigators.  At trial, the
State introduced a piece of cardboard with a handwritten number matching the
serial number on the $100 Green Dot card purchased by Cooke's ex-wife.

ECF 13-1 at 80-89.  After Cooke's conviction was affirmed by the Court of Special Appeals,  ECF

13-2 at 77-114, he did not file a petition for a writ of certiorari to the Court of Appeals of Maryland.

ECF 1 at 2.

However, on August 29, 2017, Cooke filed a *pro se* petition under Maryland's Uniform

Postconviction Procedure Act ("UPPA").  ECF 13-1 at 108-96.   The claims Cooke raised in the

postconviction proceeding included the claims he now raises in his federal habeas petition,

including "failure to object to the use of contradictory trial theories," "violation of Cooke's sixth

amendment right to counsel," "violation of Cooke's Miranda rights," "violation of Cooke's right

to due process" by introducing "incriminating statements or actions that are involuntary," and the

State's "knowing use of the perjured testimony."  *Id.* at 242, 244, 245, 247, and 251.

The post-conviction court held three days of hearings for Cooke's petition, on March 29,

2018, June 11, 2018, and June 12, 2018.  ECF 13-15, 13-16, 13-17.  On February 12, 2019, the

court issued a written ruling explaining its denial of the petition. ECF 13-1 at 302-12 ("Statement

of Reasons and Order of the Court").   Cooke's application for leave to appeal to the Court of

Special Appeals was summarily denied on September 9, 2019. ECF 13-1 at 347-48. Thereafter,

Cooke timely filed the instant petition seeking federal habeas relief.

## II.    STANDARD OF REVIEW

The governing habeas statute, 28 U.S.C. § 2254, limits this Court to considering the law as it was "clearly established" by Supreme Court precedent at the time of the state court's decision. Specifically, section 2254 provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The "unreasonable application" prong of § 2254(d)(1) permits a federal habeas court to "grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts" presented. *Williams v. Taylor*, 529 U.S. 362, 413 (2000); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). The state judge's application of Supreme Court precedent must be "objectively unreasonable," not merely incorrect or erroneous. *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 409; *see also Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003). In other words, relief under the "unreasonable application" prong is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall,* 572 U.S. 415, 427 (2014) (quoting *Harrington v. Richter,* 562 U.S. 86, 103 (2011)).

A similar standard applies to the second prong of the habeas statute, which requires an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has explained that, "To secure habeas relief, petitioner must demonstrate that a state court's [factual] finding . . . was incorrect by clear

and convincing evidence, 28 U.S.C. § 2254(e)(1), and that [it] was 'objectively unreasonable' in light of the record before the court." *See Miller-El v. Cockrell,* 537 U.S. 322, 348 (2003); *Grueninger v. Director, Va. Dep't. of Corrections*, 813 F.3d 517, 524 (4th Cir. 2016) ("And a state court's factual findings must be presumed correct, absent rebuttal by the petitioner by clear and convincing evidence.").

With respect to four of the five arguments Cooke raises, he advances ineffective assistance claims in addition to claims that his constitutional rights were violated.  As to the ineffective assistance claims, the two-part test announced in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), governs this Court's examination. First, a petitioner must demonstrate that the performance of his counsel was deficient because it fell below an objective standard of reasonableness. *Id.* Second, a petitioner must exhibit that he suffered prejudice as a result of the deficient performance. *Id.* The Supreme Court emphasized that courts should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered a sound trial strategy." *Id.* at 689.  In the context of a § 2254 proceeding, it is not sufficient to convince the federal habeas court that the state court merely applied *Strickland* incorrectly. Rather, a petitioner must meet a higher burden and show that the state court applied *Strickland* in an objectively unreasonable manner. *See  Bell v. Cone*, 535 U.S. 685, 698–99 (2002) ("For respondent to succeed, however, he must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance")**;** *see also Owens v. Stirling*, 2020 WL 4197742, at *9 (4th Cir. July 22, 2020) (stating AEDPA and *Strickland* create a "double-deference standard").

## III.   ANALYSIS

Cooke raises five issues, which are addressed sequentially below.

1.      **Alleged Violation of Sixth Amendment Right to Counsel**

Citing the Supreme Court's holding in *Massiah v. United States*, 377 U.S. 201 (1964), Cooke contends that DiVenti's testimony, in which he described the statements Cooke made to him in prison, violated Cooke's Sixth Amendment right to counsel.  ECF 1-1 at 3.  In *Massiah*, a merchant seaman was arrested for possession of narcotics aboard a United States vessel. 377 U.S. at 1201. When one of the seaman's alleged co-conspirators decided to cooperate with the government, agents installed a radio transmitter in a vehicle belonging to the co-conspirator. *Id.* While both individuals were on pretrial release, the government listened to Massiah making incriminating statements about the pending case to his co-conspirator.  *Id.*  The Supreme Court held that Massiah "was denied the basic protections of [the Sixth Amendment] guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Id.* at 206.  The Fourth Circuit has summarized the salient factors establishing a *Massiah* violation as follows: "that the inmate witness was a paid informant acting on instructions from the government, that the informant was ostensibly no more than a fellow inmate of the defendant, and that the defendant was in custody and under indictment at the time he incriminated himself." *Thomas v. Cox,* 708 F.2d 132, 134 (4th Cir. 1983) (quoting *United States v. Henry,*  447 U.S. 264, 270 (1980)).

The instant case involves an important distinction from the facts in *Massiah*: Cooke was tried simultaneously for two entirely separate criminal offenses.  At the time of his incarceration with DiVenti, Cooke's right to counsel had attached with respect to Ms. Bernadzikowski's murder. However, Cooke had not yet been charged with, and thus had no right to counsel with respect to, his ongoing efforts to harm or intimidate Lewis.

In addition, unlike in *Massiah*, DiVenti's testimony covered statements Cooke made to him in three different time frames.  The first set of statements DiVenti testified about were made by Cooke before DiVenti had even contacted law enforcement officials about his relationship with his cellmate.  *See* ECF 13-1 at 350-53 (describing the first meeting between DiVenti and law enforcement on June 19, 2014, when DiVenti reported what Cooke had told him previously about Ms. Bernadzikowski's murder and about his desire to harm or intimidate Lewis).  Any statements made in that context were not made to an informant "acting on instructions from the government," because DiVenti was a fellow inmate at that time, and had not yet become a government agent in any respect.  DiVenti's testimony about the statements made before he was in contact with law enforcement about Cooke would not be precluded by *Massiah*.  *See, e.g., United States v. Lentz*, 524 F.3d 501, 520 (4th Cir. 2008) (noting that the "mere presence of a jailhouse informant who had been instructed to overhear conversations and to engage a criminal defendant in some conversations is not necessarily unconstitutional.  The Court must look at all of the circumstances to determine whether the informant's actions are 'fairly attributable to the government.'").

The second category of statements are those DiVenti recorded at the government's behest. Clearly, at that point, DiVenti was acting in accordance with government instructions.[1]  However, those statements pertained, not to Ms. Bernadzikowski's murder, but to Cooke's intent with respect to Lewis.  Accordingly, the post-conviction court found:

> At the time Petitioner spoke with Diventi, Petitioner was not yet charged with Solicitation to Intimidate a Witness.  As the 'United States Supreme Court has frequently reiterated,' ''the Sixth Amendment right [to counsel] . . . is offense-

---

[1] Additionally, the instructions the government provided DiVenti comported with the law.  The Assistant State's Attorney expressly and repeatedly instructed DiVenti not to question or interrogate Cooke.  *See*  Recording of June 9, 2014 Interview at time stamp 13:36:13 to 13:40:02. Sergeant Meyer, upon installing DiVenti's first body wire, reminded him that he could not "bring up or ask any questions of Cooke regarding his pending murder charges." ECF 13-1 at 354.  Those instructions were repeated upon installation of the second body wire on July 9, 2014.  *Id.* at 355.

specific.'' Unless the new charge is 'closely related' to those for which Petitioner was already under indictment, there is no 'carry-over' and the Sixth Amendment right to counsel does not attach.

ECF 13-1 at 307 (internal citations omitted).

The post-conviction court accurately summarized the state of Supreme Court law, which confirms the offense-specific nature of the right to counsel. *See McNeil v. Wisconsin,* 501 U.S. 171, 175 (1991) ("The Sixth Amendment right, however, is offense specific."). In fact, Cooke's case is essentially on all fours with *United States v. Mir*, 525 F.3d 351, 356 (4th Cir. 2008). In that case, Mir, an immigration attorney, was charged with fraud for falsifying labor certifications for aliens. *Id.* After receiving information that Mir was engaging in witness tampering after his indictment, the Government sent two of the aliens to engage in recorded and unrecorded conversations with Mir. *Id.* at 353. Mir subsequently argued that admission of those post-indictment statements violated his Sixth Amendment rights, because the conversations "were intertwined with the indicted offenses of labor certification fraud to which Mir's Sixth Amendment right to counsel had attached." *Id.* at 355. The Fourth Circuit disagreed, while acknowledging "a point of factual overlap between the two offenses – namely, that Mir allegedly attempted to induce false statements by two witnesses to the underlying labor certification fraud." *Id.* at 356. Nevertheless, the Court found that "there is no exception to the offense-specific nature of the Sixth Amendment for uncharged offenses that are 'factually related.'" *Id.* The panel explained that the "Sixth Amendment simply does not provide defendants with a license to commit additional crimes with impunity," particularly because witness tampering "bear[s] fundamentally on the ability of the criminal justice system to do its job." *Id.* at 356. Similarly, in the instant case, admission of the recorded statements relating to the witness tampering offense did not implicate Cooke's Sixth Amendment rights, because his right to counsel had not yet attached for that additional crime.

13

The third and final set consists of the unrecorded statements DiVenti reported to law enforcement subsequent to procuring the recorded conversations. In other words, DiVenti had already acted as a "government agent," but was not acting at government direction in his later discussions with Cooke.  Specifically, when law enforcement officers brought DiVenti to headquarters to review the transcripts from the earlier recordings, DiVenti reported that Cooke had made further statements to him about Ms. Bernadzikowski's murder and efforts to have Alexander Bennett killed.  ECF 13-1 at 366. To establish a Sixth Amendment violation pertaining to those statements, Cooke would have to show that his statements were made in response to interrogation or questioning by DiVenti.  *See Kuhlmann,* 477 US at 459 ("[T]he defendant must demonstrate that the police and their informant took some action beyond merely listening, that was designed deliberately to elicit incriminating remarks.").  As noted above, on federal habeas review, Cooke would have to establish that the post-conviction court's conclusion was objectively unreasonable. In light of the ample evidence that DiVenti adhered to the instructions not to question Cooke, and that Cooke volunteered the statements, that high standard is not met.  *See, e.g.,* Video Recording: Interview of DiVenti, at 08:18 – 08:24 (stating that the prosecutor told DiVenti not to ask Cooke any questions) (Sep. 4, 2014);  ECF 13-16 at 31-32 (Assistant State's Attorney testimony that he knows of no evidence that DiVenti questioned or prompted Cooke to talk about Ms. Bernadzikowski's murder); ECF 13-16 at 219 (testimony from Cooke's attorney that "I didn't view him as interrogating Mr. Cooke on any of those audios, so I didn't file anything regarding suppression.").

DiVenti's testimony cannot be painted with the single broad brush Cooke attempts to use, because it consisted of different sets of statements made under different circumstances. Ultimately, Cooke has adduced no evidence of any statements DiVenti procured from him via interrogation or

14

questioning, regarding Ms. Bernadzikowski's murder, after his right to counsel had attached. Accordingly, he has not established a violation of *Massiah* or his Sixth Amendment rights.

As the Fourth Circuit has determined, "Counsel is not required to engage in the filing of futile motions." *Sharpe v. Bell,* 593 F.3d 372, 383 (4th Cir. 2010). Here, because a motion premised on a *Massiah* violation would have been unsuccessful, Cooke's counsel did not commit ineffective assistance, or any error whatsoever, by declining to file it.

**2.      Use of Incriminating Statements Allegedly Obtained Via Intimidation and Coercion**

Cooke contends that his statements to DiVenti were involuntary, because DiVenti engaged in intimidation and coercion to procure them. In support, he cites *Arizona v. Fulminante*, 499 U.S. 279, 316 (1991). In that case, Oreste Fulminante, while incarcerated for a gun-related offense, was suspected of murdering his 11-year-old stepdaughter. *Id.* at 283. A second inmate warned Fulminante about "tough treatment" that he might receive from other inmates, as a result of the rumor. *Id.* After the second inmate offered to protect Fulminante in exchange for his telling the complete truth, Fulminante admitted to killing the stepdaughter. *Id.* Upon being charged with the murder, Fulminante successfully moved to suppress the confession, as the Supreme Court found that it was coerced. *Id.* at 1252–53 ("Our cases have made clear that a finding of coercion need not depend upon actual violence by a government agent; a credible threat is sufficient.").

In this case, the post-conviction court expressly made a factual finding rendering *Fulminante* inapposite: "There is no support in the record for the proposition that Petitioner was assaulted by anyone or induced to employ Diventi for the purpose of intimidating a State's witness." ECF 13-1 at 308. Cooke contends that the court's narrow finding did not eliminate the possibility that he was induced to participate in the conversations with DiVenti and to make incriminating statements. *See, e.g.*, ECF 16 at 13–16. Without question, DiVenti and Lewis

15

presented utterly contradictory testimony about the nature of their relationship.  DiVenti claimed that he never "put his hands on" Cooke, and that Cooke gave him the Green Dot number "voluntarily."  ECF 13-8 at 156-58.  In contrast, Cooke testified that DiVenti made him "feel scared for [his] life" and the lives of his family, ECF 13-11 at 127-28, and was "hateful" and "a bully."  ECF 13-11 at 207; ECF 13-16 at 198.  Cooke further testified that DiVenti physically assaulted him, and robbed him of the piece of cardboard containing the Green Dot number. ECF 13-11 at 159-60.

Notably, Cooke testified that he never told his trial counsel that he was being threatened or assaulted in jail, or that the jail had refused his requests to go into protective custody. ECF 13-16 at 202-03; ECF 13-17 at 55-56.  In fact, his trial attorney described Cooke's conduct as typically "pretty somber" except on one occasion, when he was happy and smiling and told her "that he was certain that Grant Lewis was not going to testify."  ECF 13-16 at 217-18. The attorney's testimony, then, undermines Cooke's contention that the threatening and assaultive conduct happened (because a detainee who had been subject to such behavior would likely report the behavior to his counsel). Certainly, the attorney's testimony precludes any argument regarding ineffective assistance of counsel, since counsel could not have been expected to remedy a situation about which she was unaware.

It is not lost on the Court that if an individual is indeed being threatened, he might be reluctant to reveal that behavior even to his attorney. Ultimately, however, the post-conviction court's resolution of the contradictory witness testimony constitutes a credibility determination that is outside the purview of federal habeas review.  *See Merzbacher v. Shearin,* 706 F.3d 356, 364  (4th Cir. 2013) ("[F]ederal habeas courts have no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.") (quoting

*Cagle v. Branker,* 520 F.3d 320, 324 (4th Cir. 2008)).  In order to prevail on a federal habeas claim

premised on a factual finding, a petitioner must show that the state court's finding was objectively

unreasonable — a burden that Cooke has failed to meet here.  *See Elmore v. Ozmint,* 661 F.3d 783,

850 (4th Cir. 2011) ("We consider whether the state court based its decisions on an objectively

unreasonable factual determination in view of the evidence before it, bearing in mind that factual

determinations by state courts are presumed correct absent clear and convincing evidence to the

contrary."). The post-conviction court's conclusion that there was no evidence to support Cooke's

alleged intimidation and abuse did not meet the exacting standard of objective unreasonableness,

in light of the ample evidence contradicting Cooke's self-serving testimony.

**3.      Use of Cooke's Statements Allegedly Obtained in Violation of *Miranda***

Cooke's third theory is that he should have been afforded the well-known warnings

required by the Supreme Court in *Miranda v. Arizona,* 384 U.S. 436 (1966), prior to his jailhouse

conversations with DiVenti.  ECF 1-1 at 12–14. *Miranda* warnings are required during custodial

interrogation of a suspect, as a result of the "police-dominated atmosphere" which might

"undermine the individual's will to resist and to compel him to speak where he would not otherwise

do so freely." *Miranda*, 384 U.S. at 445, 467.

In *Illinois v. Perkins,* 496 U.S. 292, 296 (1990), the Supreme Court noted that, "The

essential ingredients of a 'police dominated atmosphere' and compulsion are not present when an

incarcerated person speaks freely to someone whom he believes to be a fellow inmate . . . When a

suspect considers himself in the company of cellmates and not officers, the coercive atmosphere

is lacking."  This case presents even less risk of "official interrogation" than that in *Perkins,*

because in that case, an undercover agent had been inserted into the jail facility to question Perkins.

*Id.*  In this case, DiVenti was an actual cellmate and fellow prisoner. As his relationship with law

enforcement developed, the instruction he received was not to pose questions to Cooke about Ms. Bernadzikowski's murder. *See supra* at 12 n.1. As the Supreme Court reasoned, "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner." *Perkins,* 496 U.S. at 297.

Cooke's contention that he feared DiVenti and his "friends" who were dangerous fellow inmates, ECF 1-1 at 13, does not bring his case under the purview of *Miranda,* which governs interrogation by law enforcement officers, not by other intimidating individuals.[2]  Accordingly, Cooke has not established a violation of established Supreme Court precedent.  Thus, the fact that Cooke's counsel did not raise a *Miranda*-based objection to DiVenti's testimony did not amount to ineffective assistance.

### 4.      Allegedly Contradictory Factual Scenarios Presented at the Two Trials

Citing an Eighth Circuit case, *Smith v. Groose,* 205 F.3d 1045 (8th Cir. 2000), Cooke contends that the Due Process clause precluded the State from introducing material evidence and motive at his trial that contradicted the material evidence and motive presented at Lewis's trial. ECF 1-1 at  14-18. The gravamen of Cooke's contention is that, at Lewis's trial, the State presented testimony from Lewis's girlfriend, Rebecca Love.  *Id.*  Love testified that Lewis had told her he had been in contact with a female client in Maryland, and that he had sent Bennett to Maryland to murder the female client. *Id.*

Cooke is correct that Love's testimony about Lewis's inculpatory statement to her was introduced at Lewis's trial but not at Cooke's.  Cooke cannot avoid the conclusion, however, that

---

[2] Cooke's assertion that he "feared that Diventi may be working for the state," ECF 1-1 at 14, similarly did not create an atmosphere of official interrogations.  Assessment of a coercive, police-dominated atmosphere cannot turn on subjective suspicions by the interrogee, especially when that perspective could be colored, before the time of testimony, by subsequent developments.

Love's testimony about an out-of-court statement Lewis made to her would constitute inadmissible hearsay at Cooke's trial, although it was admissible under the hearsay exception for a statement of a party opponent at Lewis's own trial. *See* Fed. R. Evid. 801(c); 801 (d)(2). Thus, the State (or the defense) could not have elicited Love's testimony about Lewis's statement at Cooke's trial, unless Lewis himself had testified.[3]

Additionally, Love's testimony, as introduced at Cooke's trial, is not "irreconcilable" with the evidence presented at Lewis's trial, as Cooke contends. *See* ECF 16 at 27–28. Rather, it is abundantly evident from the transcripts that the State's theory in Lewis's trial matched its theory in Cooke's trial: that Cooke, not Ms. Bernadzikowski, had hired Lewis, who in turn hired Bennett to murder her. *See* ECF 13-1 at 374 (excerpt from State's opening statement in Lewis's trial, "The Defendant had placed online an advertisement for quick professional cleaning services. This is code language for a hit, for a murder for hire. And that ad was answered by an e-mail from Steven Cooke, Heidi's boyfriend."). In fact, Lewis's unchallenged testimony at his own trial was that his original client was Cooke, not Ms. Bernadzikowski, but he maintained that he and Bennett had planned to scam Cooke of the fee for the murder, without actually committing the killing. ECF 13-1 at 403-04, 405, 408-09. At closing argument in Lewis's trial, the State emphasized that Love's testimony had been important because Lewis had told her that he "sent Bennett to Baltimore to kill a woman. Not to pull a scam, not to extort; not to steal. To kill a woman. That is her recollection." ECF 13-1 at 437. In other words, the State relied upon Love's testimony, not because it credited

---

[3] Cooke's own attorney acknowledged the inadmissibility of Love's testimony at Cooke's trial. *See, e.g.* ECF 13-16 at 214 (testimony that she did not call Love because "the only way I was going to get her to testify as to what she –she was told by Mr. Lewis was I was going to have to call Mr. Lewis. He was either going to have to deny making that statement, or he was going to have to plead the Fifth Amendment. And I didn't know what he was going to do.")

what Lewis had told her about the gender of his original client, but because Lewis's statement to Love debunked his trial theory that he and Bennett had only intended to scam, not to murder.

The ruling in *Smith v. Groose,* then, provides no basis for Cooke's federal habeas claim. *Groose* concerned the petitioner, Jon Keith Smith, who was convicted of first degree felony murder, among other charges, in Missouri. 205 F.3d at 1046–47.  At Smith's trial, the prosecutor relied extensively on a statement made by an individual that was with Smith on the night of the murder. *See id.* at 1050. However, at a subsequent trial for a separate defendant, the state did not introduce the statement and, instead, relied on a different theory. *See id.*  As an initial matter, precedent from a federal circuit court "does not constitute clearly established Federal law, as determined by the Supreme Court.  It therefore cannot form the basis for habeas relief under [§ 2254(d)]."  *Parker v. Matthews,* 567 U.S. 37, 48-49 (2012) (citations and internal quotation marks omitted.).

In any event, in contrast to *Groose*, the State presented matching theories in Cooke's and Lewis's respective trials. Moreover, Love's testimony was omitted from Cooke's trial not for some nefarious reason, but rather because it was inadmissible. Thus, even if *Groose* could provide a viable basis for federal habeas relief, it is inapposite. Finally, with respect to the ineffective assistance of counsel claim, because Love's testimony could not have been introduced into evidence at Cooke's trial, Cooke's attorney did not provide ineffective assistance in declining to raise those issues.

5.    **The State's Alleged Use of Perjured Testimony**

Cooke's final assertion is that "the State violated his right to due process by knowingly using perjured testimony to convict him."  ECF 1-1 at 18.  He relies on *Napue v Illinois*, 360 U.S. 264, 265 (1959), in which the Supreme Court determined that "the failure of the prosecutor to

correct the testimony of the witness which he knew to be false denied petitioner due process of law in violation of the Fourteenth Amendment to the Constitution of the United States."

In *Napue,* in a subsequent proceeding for writ of error *coram nobis* for a cooperating witness, the prosecutor averred that he had promised the cooperating witness to recommend reduction of his sentence in exchange for his testimony.  *Id.* at 266.  That promise directly contradicted the testimony the cooperating witness had given at Napue's trial, where he had testified that he had received no promise of consideration in exchange for his testimony.  *Id.* at 265.  On direct appeal, the Illinois Supreme Court made factual findings that the prosecutor had promised to recommend the sentencing reduction, and that the prosecutor knew that the cooperating witness had lied at Napue's trial when he denied that such a promise had been made.  *Id.* at 267-68.

The record in the instant case contains no similar factual findings suggesting the State's knowing use of perjured testimony.  In fact, the post-conviction court expressly rejected Cooke's speculation that an undisclosed bargain had been made: "For example, there is no evidence that Mr. Diventi received any illicit benefit from the State for his cooperation as Petitioner claims.  In fact, the record supports the opposite conclusion as the State recommended to the sentencing judge that Mr. Diventi should not receive any benefit for his cooperation."  ECF 13-1 at 311.

Federal habeas relief is therefore not warranted on either prong of the habeas analysis.  First, because there is no factual finding of perjured testimony in this case, the post-conviction court's ruling cannot be viewed as violative of the Supreme Court's ruling in *Napue.*  Second, the post-conviction court's factual conclusion, regarding the absence of any evidence of an illicit bargain between DiVenti and the State, was not objectively unreasonable in light of the ample and uncontroverted evidence to support it. *See, e.g.* ECF 13-8 at 123 (DiVenti testimony that he had

been offered "None whatsoever.  Never had an offer for any kind of break.  Nothing."); ECF 13-15 at 93, 102 (Assistant States Attorney testimony that it was "abundantly clear" to DiVenti that the State "was not offering him any help with his sentencing" and that he had instructed the prosecutor's in DiVenti's case to "not give [him] any benefit for . . . anything" he was doing in Cooke's case;  ECF 13-17 at 31, 48 (testimony from DiVenti's attorney that he "tried to dissuade" DiVenti from working with the police because he was "not going to get anything from" it and that on the day of the sentencing, the prosecutor took the position "that she was not going to recommend any clemency for [DiVenti] based on" his assistance in Cooke's case.).  Accordingly, Cooke has not established that the State "allowed Diventi and Sergeant Meyer to falsely testify" about a bargain between DiVenti and the State. *See* ECF 16 at 29.

## IV.    Cumulative effect of errors by counsel

As described above, Petitioner has not established any constitutional errors that were committed by his counsel.  Thus, even viewed collectively, counsel's performance was not constitutionally deficient because acts or omissions "that are not unconstitutional individually cannot be added together to create a constitutional violation."  *Fisher v. Angelone*, 163 F.3d 835, 852–53 (4th Cir. 1998).

## V.    Certificate of Appealability

This Court shall not issue a certificate of appealability absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2000).  To satisfy that standard, a petitioner must demonstrate that reasonable jurists would find an assessment of the constitutional claims, and the dispositive procedural ruling dismissing the claims, to be "debatable." *Miller–El v. Cockrell*, 537 U.S. 322, 336–38 (2003); *Rose v. Lee*, 252 F.3d 676, 683–84 (4th Cir.2001). Because Petitioner has not met that standard, a certificate of appealability is DENIED.

For the reasons stated herein, Cooke's Petition for Writ of Habeas Corpus is DENIED. A separate Order follows.

Dated:  August 4, 2020

_____/s/_____
Stephanie A. Gallagher
United States District Judge